# EXHIBIT 1

Paul D. Stevens (Cal. Bar. No. 207107)
pstevens@stevenslc.com
Lauren A. Bochurberg (Cal. Bar. No. 333629)
lbochurberg@stevenslc.com
**STEVENS, LC**
1855 Industrial Street, Suite 518
Los Angeles, California 90021
Tel: (213) 270-1211

*Attorneys for Plaintiff and the Proposed Class*

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/20/2025 12:56 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| JAIME MORENO, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>POLYLOOM CORPORATION OF AMERICA, a Delaware corporation doing business in California; SYNTHETIC GRASS WAREHOUSE; HOME DEPOT U.S.A., INC., a Delaware corporation doing business in California; AND DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.  25STCV17861<br><br><u>CLASS ACTION COMPLAINT</u><br><br>1. VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17500, *et seq.*<br><br>2. VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *et seq.* |

Plaintiff Jaime Moreno (hereinafter "Plaintiff"), individually and on behalf of himself and others similarly situated (hereinafter "the Class" or "Class Members"), alleges the following:

## I.     NATURE OF THE ACTION AND STATEMENT OF FACTS

1.     This is an important consumer protection matter that concerns two issues: i) the omission and non-disclosure of information that is a material concern for consumers—the existence of, and potential health risks from, organic fluorine in synthetic, artificial turf manufactured, distributed,  marketed and sold by Defendants POLYLOOM CORPORATION OF AMERICA ("POLYLOOM"), SYNTHETIC GRASS WAREHOUSE (" SGW") and HOME DEPOT U.S.A., INC., ("HOME DEPOT") (collectively "Defendants") under the brand name "TrafficMaster" ("the Products") in Violation of Business and Professions Code § 17500, *et seq*. ("FAL") and Business and Professions Code § 17200, *et seq*.; and ii) the false and misleading marketing of the Products being safe for humans and the environment given the existence of, and potential health risks from, organic fluorine in the Products.

2.     Through an extensive, widespread, comprehensive, and uniform nationwide marketing campaign, including creating marketing materials pertaining to the Products for third-party sellers, Defendants promoted the Products as being safe for humans and the environment by way of marketing language that includes, but is not limited to, claims that the Products are "non-toxic", "guaranteed to keep you safe and healthy", "sustainable", made with "eco-friendly properties" and "without PFAS chemicals". Per-and-polyfluoroalkyl substances (PFAS) are a collective name for a broad class of man-made chemicals of emerging concern due to potential human and environmental health risks. In so doing, Defendants promoted the net impression that the Products are a safer and healthier synthetic grass alternative for both humans and the environment that is free of PFAS (herein referred to as the "Net Impression").

**A. Defendants' False, Misleading and Deceptive Extensive and Long-Term Marketing Campaign to Minimize the Presence and Risks of Harmful Chemicals in Synthetic Turf, Including the Products.**

3.      The history of advertising artificial grass to consumers has evolved alongside the product's development—from a novelty in sports arenas to a widely marketed landscaping option.  Artificial turf was developed in the early 1960s by Monsanto and branded as "ChemGrass"—later renamed "AstroTurf" after being installed in the Houston Astrodome in 1966.  Early advertisements and public messaging targeted sports facilities for durability and ease of maintenance.  Companies began introducing artificial turf for home use in the 1980's, especially in arid regions (e.g., Southern California, Arizona).  Advertising focused on low water usage, no mowing, and green lawns year-round.  In the 2000s, Companies began targeting eco-conscious consumers, emphasizing water conservation and chemical-free maintenance.

4.      Defendants violated the UCL and FAL by participating in and conducting a decades-long campaign of deceptive advertising and misleading statements and omissions to, among others, the consumers of its products concealing and or minimizing the growing body of scientific research and evidence showing the presence of harmful chemicals in synthetic turf, including the Products, and potential environmental and health implications.

5.      Defendants have continued their decades-long campaign of deceptive advertising and misleading statements and omissions to, among others, the consumers of its products concealing and or minimizing the growing body of scientific research and evidence showing the presence of harmful chemicals in synthetic turf, including the Products, and potential environmental and health implications.   Examples of current deceptive advertising and misleading statements and omissions and other activities to, among others, the consumers of its products concealing and or minimizing the growing body of scientific research and evidence showing the presence of harmful chemicals in synthetic turf, including the Products, and potential environmental and health implications include but are not limited to the following marketing, advertising and other activities:

CLASS ACTION COMPLAINT

a.     Defendant SGW promotes the Products through the following false, misleading and deceptive statements on SGW's website pages.  The statements and terminology that are false, misleading and or add to the deception are identified in bold and set forth below:

i.



With the widest selection of synthetic turf products available, we're the one-stop shop for artificial grass! We also supply all the necessary tools and turf accessories to help you seamlessly enhance any outdoor landscape. Our large selection of artificial grass ensures that we have something that suits any landscape project!

As an innovator in the industry, we have the unique opportunity of providing the highest quality products for our customers at price points that can fit anyone's budget. In addition to providing you with innovative top quality synthetic grass products, our fast same-day shipping ensures that your order will arrive on time with no delays!

⎯⎯

- As an innovator in the industry, we have the unique opportunity of providing the **highest quality** products.
- **In addition to providing you with innovative top quality synthetic grass products**, our fast same-day shipping ensures that your order will arrive on time with no delays!
  https://syntheticgrasswarehouse.com/

ii.

TOGETHER WITH 🐾TENCATE

Artificial = Sustainable

At SGW, we work closely with our suppliers, developers, and customers to continue pushing the limits of artificial grass. Partnered with TenCate, our decades of experience and expertise in the industry have been influential in creating products that are durable for everyday use, but gentle for our planet. With the reduction of pesticides, use of water, and use of gas-powered tools, artificial grass has many eco-friendly properties.

SGW is committed to providing certified safe products that are guaranteed to be lead-free making it great for your family and pets.

- At SGW, we work closely with our suppliers, developers, and customers to continue pushing the limits of artificial grass.
- With the reduction of pesticides, use of water, and use of gas-powered tools, artificial grass has many **eco-friendly properties**.
- SGW is committed to providing certified **safe products** that are guaranteed to be lead-free making it great for your family and pets.
- **Artificial= Sustainable**
  https://syntheticgrasswarehouse.com/

4
CLASS ACTION COMPLAINT

iii.



- **No intentionally added PFAS**
  https://syntheticgrasswarehouse.com/

iv.

Since 2004, Synthetic Grass Warehouse continues to be the leading distributor of Artificial Grass in the nation. We are committed to providing the best artificial turf products at competitive prices that are safe for everyone, especially children and pets. The only thing better than our grass is our customer service.

- We are committed to providing the best artificial turf products at competitive prices that are **safe for everyone**, especially children and pets.
  https://syntheticgrasswarehouse.com/company/

v.

SGW has always stood out among competitors, offering new products with the latest technology, which is why we have partnered with TenCate to continue our drive to give our customers the best and safest products on the market. We only offer products that maintain a high standard of quality and safety.

- To give our customers the best and **safest products** on the market. We only offer products that maintain a high standard of quality and safety.
  https://syntheticgrasswarehouse.com/company/

CLASS ACTION COMPLAINT

vi.

> At SGW, our mission is to provide the safest, most durable, and highest quality products available. With our multiple warehouse locations across the United States, we have been able to provide installers and homeowners with superior products in a fast turn around. Because of our size and vertical partnership with TenCate, we are able to provide the best prices available for our superior products.

- At SGW, our mission is to provide **the safest**, most durable, and highest quality products available.
  https://syntheticgrasswarehouse.com/company/about-sgw/

vii.



- Every turf product is made with high quality materials that **are safe for everyone, especially children and pets**.
- Quality Driven. At SGW we only offer products that maintains a high standard of quality.
  https://syntheticgrasswarehouse.com/company/about-sgw/

viii.

### Is artificial grass safe for children and pets?

Yes. All Synthetic Grass Warehouse turf products are lead-free and safe for both kids and pets.

We also offer a selection of artificial grass products specially engineered for use in pet-friendly areas and kids' playgrounds. Our IPEMA-certified PlayScapes system includes an eco-friendly foam underlayer that protects kids from impact falls, and our pet turf is ultra-durable for all-day running and roughhousing.

- Is artificial grass safe for children and pets? Yes. All Synthetic Grass Warehouse turf products are lead-free and **safe** for both kids and pets.
  https://syntheticgrasswarehouse.com/resources/terminology/faqs/

6
CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ix.

**How is artificial grass eco-friendly?**

In addition to being aesthetically appealing and low maintenance, synthetic grass also aids in multiple aspects of environmental conservation.

1. **Water Conservation:** In most parts of the country, natural grass needs to be watered several times per week to stay green and healthy. SGW artificial grass, by contrast, never needs to be watered to remain green, aiding in water conservation efforts.
2. **Less Chemical Use:** Say goodbye to fertilizers, pesticides, herbicides and other harmful chemicals when you switch to artificial turf. Harmful chemicals from natural grass maintenance products often seep into the soil and nearby water sources, potentially damaging the local environment. With SGW turf, you can have a safer, family-friendly lawn.
3. **Reduced Air Pollution:** Lawnmowers, leaf blowers, edgers and other gas-powered maintenance tools required for natural grass lawns all create air pollution. When you switch to SGW artificial turf, you can get rid of those mowers and edgers, reducing carbon emissions and improving local air quality.

- How is artificial grass **eco-friendly**? Less Chemical Use: Say goodbye to fertilizers, pesticides, herbicides and other harmful chemicals when you switch to artificial turf. Harmful chemicals from natural grass maintenance products often seep into the soil and nearby water sources, potentially damaging the local environment. With SGW turf, you can have a **safer**, family-friendly lawn.
https://syntheticgrasswarehouse.com/resources/terminology/faqs/

x.

**Is artificial grass safer than natural grass for outdoor playgrounds?**

SGW's PlayScapes system is a playground landscaping system specially engineered to be safe and fun for kids of all ages.

All our play area turf products are IPEMA-certified and meet or exceed all standards set by the American Society for Testing and Material. They are installed with an eco-friendly foam underlayer that protects kids from impact injuries and falls from up to 10 feet high. Our foam padding maintains GMax scores, so you can rest assured that our artificial turf products are some of the safest and most durable landscaping options available on the market for children's use.

All SGW turf and installation products are non-toxic and safe for both kids and pets, so you can keep germs at bay and better protect your kids at play without sacrificing fun.

- Is artificial grass safer than natural grass for outdoor playgrounds? **All SGW turf and installation products are non-toxic and safe for both kids and pets**, so you can keep germs at bay and better protect your kids at play without sacrificing fun.
https://syntheticgrasswarehouse.com/resources/terminology/faqs/

7
CLASS ACTION COMPLAINT

b.    Defendant HOME DEPOT promoted, and continue to promote, the Products through the following false, misleading and deceptive statements on HOME DEPOT'S website pages.  The statements and terminology that are false, misleading and or add to the deception are identified in bold and set forth below:

i.

- This artificial turf is recommended for residential and commercial applications, is **safe for dogs and children**.
https://www.homedepot.com/p/TrafficMaster-Fescue-Multipurpose-12-ft-Wide-x-Cut-to-Length-Green-Artificial-Grass-Turf-TMCSBRN4212CTL/313236731

ii.

- Artificial grass rug **is pet/dog and family friendly**.
https://www.homedepot.com/p/TrafficMaster-TruGrass-Emerald-12-ft-Wide-x-Cut-to-Length-Green-Artificial-Grass-Turf-TGEM/300853674

c.    Since 2003, the Synthetic Turf Council ("STC") has engaged in advocacy, membership and marketing of synthetic turf, including in the areas of use of sports fields, golf, municipal parks, airports, landscape and residential applications.  The STC's current vision and activities is "Inspire and connect healthier communities through synthetic turf spaces." https://www.syntheticturfcouncil.org/page/AboutSTC.

6.    In or about June 2025, Defendant POLYLOOM preemptively sued four scientific experts for defamation ahead of a seminar where they planned to talk about research into the potential health risks on playgrounds and sports fields nationwide. https://www.nytimes.com/2025/06/17/climate/artificial-turf-grass-lawsuit-defamation-health-risk.html?smid=nytcore-ios-share&referringSource=articleShare    Through the long-term marketing and advertising campaign described in paragraphs 3, 4, 5 (collectively referred to as "the long-term marketing and advertising campaign of synthetic artificial grass"), Defendants were able to sell the Products to thousands of consumers throughout California and the rest of

CLASS ACTION COMPLAINT

the United States. The Products are sold individually for prices ranging from $2.44/ sq. ft. to $4.25/ sq. ft. per product.

7.    Plaintiff was exposed to the long-term marketing and advertising campaign of synthetic artificial grass.

8.    Plaintiff reasonably understood the net impression of the long-term marketing and advertising campaign of synthetic artificial grass to mean that the Products were non-toxic, sustainable, made with eco-friendly properties and without PFAS chemicals and are safe for both humans and the environment when purchasing the Products (hereafter collectively referred to as "the Misrepresentations").

9.    Based on the long-term marketing and advertising campaign of synthetic artificial grass, reasonable consumers believe that the Products are created without PFAS chemicals, are non-toxic, safe, healthy, sustainable and eco-friendly. Put differently, reasonable consumers believe that the Products do not contain any ingredients that can harm them or the environment. This perception is consistent with standard dictionary definitions, regulatory definitions and the California legislature's interpretation of environmental advertising claims.

   a. **Dictionary – Toxic.** The Merriam-Webster standard dictionary defines "toxic" as "extremely harsh or harmful."[1]

   b. **Dictionary – Safe.** The Merriam-Webster dictionary defines "safe" as "free from harm or risk."[2]

   c. **Dictionary – Healthy.** The Merriam-Webster standard dictionary defines "healthy" as "enjoying good health" and "free from disease."[3]

   d. **Dictionary – Sustainable**. The Merriam-Webster standard dictionary defines "sustainable" as "using resources so that the resource is not depleted or permanently damaged."[4]

---

[1] https://www.merriam-webster.com/dictionary/toxic#:~:text=%3A%20extremely%20harsh%2C%20malicious%2C%20or%20harmful
[2] https://www.merriam-webster.com/dictionary/safe
[3] https://www.merriam-webster.com/dictionary/healthy
[4] https://www.merriam-webster.com/dictionary/sustainable

9
CLASS ACTION COMPLAINT

e.  **Dictionary – Eco-Friendly**. The Merriam-Webster standard dictionary defines "eco-friendly" as "not environmentally harmful." [5]

f.  **FTC Green Guides.** Notably, the FTC promulgated the Guides for the Use of Environmental Marketing Claims, codified at 16 C.F.R. § 260.1, *et seq.* ("Green Guides"), to "help marketers avoid making environmental marketing claims that are unfair or deceptive" based on the FTC's "views on how reasonable consumers likely interpret [those] claims." *Id*. at § 260.1(a), (d). In its view, "[u]nqualified general environmental benefit claims . . . likely convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has no negative environmental impact." *Id*. at § 260.4(b) (providing "EcoFriendly" as an example) (emphasis added).

g.  **California Legislature.** The California legislature codified the Green Guides to make it "unlawful for a person to make an untruthful, deceptive, or misleading environmental claim, whether explicit or implied." <u>Cal. Bus. & Prof. Code</u> § 17580.5. California viewed terms "on the label or container of a consumer good" like "environmental choice", "ecologically friendly", "earth friendly", "environmentally friendly", "ecologically sound", "environmentally sound", "environmentally safe", "ecologically safe", "environmentally lite", "green product", "or any other like term" to mean that the product "is not harmful to, or is beneficial to, the natural environment". *Id*. at §17580(a) (emphasis added); see also *id*. at § 17581 (criminalizing such deceptive labeling claims).

10.    Consumers today are increasingly conscious of brands' efforts to make a positive difference in the world.[6] Sustainable marketing is the promotion of environmentally and socially

---

[5] https://www.merriam-webster.com/dictionary/eco-friendly
[6] https://www.linkedin.com/pulse/5-key-elements-successful-wellness-brand-pr-strategy-examples/

CLASS ACTION COMPLAINT

responsible products, practices, and brand values.[7][8]  Incorporating social responsibility into brands' public relations strategies can make a profound impact on consumer decisions.

11.    Thus, there is a continuous incentive for companies such as Defendants' to market themselves as being environmentally conscious.

**B. The Existence of Chemicals in the Products that Implicates Health And Safety Concerns that a Reasonable Consumer Would Find Material**.

12.    The Products at issue contain, among other things, organic fluorine, which places consumers at risk of PFAS exposure.

13.    According to the U.S. Centers for Disease Control and Prevention (CDC), PFAS are a group of over 9,000 synthetic chemicals that have been used in industry and consumer products, worldwide, for over 70 years.[9]

14.    The California legislature has found and declared the following: "PFAS," are highly toxic and highly persistent in the environment. See Cal. Health & Safety Code § 108981(a).

15.    The California legislature has found and declared the following: PFAS are referred to as "forever chemicals" because they are extremely resistant to degradation in the natural environment, including the water, the soil, the air, and our bodies, because of their carbon-fluorine bond, one of the strongest bonds known in nature. See Cal. Health & Safety Code § 108981(b).

16.    The California legislature has found and declared the following: PFAS have been linked by scientific, peer- reviewed research to severe health problems, including breast and other cancers, hormone disruption, kidney and liver damage, thyroid disease, developmental

---

[7] https://www.smartinsights.com/online-brand-strategy/brand-positioning/sustainable-marketing-how-should-you-use-it /
[8] https://abmatic.ai/blog/sustainable-marketing-strategies-building-brands-with-environmental-responsibility#:~:text=Sustainable%20marketing%20focuses%20on%20integrating,customers%20who%20value%20environmental%20stewardship.
[9] https://www.cdc.gov/niosh/topics/pfas/default.html

---

harm, and immune system disruption, including interference with vaccines. See Cal. Health & Safety Code § 108981(c).

17.    The CDC outlines several health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, increased risk of asthma and thyroid disease.[10]

18.    Other studies have associated exposure to PFAS with increased pregnancy losses, disruption in sex hormone homeo-statis and sexual maturation.[11]

19.    Because of the widespread use of PFAS, they can be found in water, air, animals, and soil at locations across the nation and the globe. Due to this widespread use, the CDC's National Health and Nutrition Examination Survey (NHANES) found PFAS in the blood of 97 percent of Americans, suggesting virtually ubiquitous exposure of Californians to these highly toxic chemicals. Widespread use has also resulted in broad PFAS dispersal in indoor and outdoor environments, including the PFAS contamination of the drinking water of approximately 16 million Californians, particularly in disadvantaged communities, of breast milk, and of indoor and outdoor air. See Cal. Health & Safety Code § 108981(e).

20.    Because PFAS chemicals are "forever chemicals" and accumulate in the human body and environment, there is no safe manner or level of exposure to humans.

21.    Under the California Health & Safety Code, the presence of PFAS in a juvenile and other products are measured in total organic fluorine. See, for example, Cal. Health & Safety Code §§ 108945(b)(2); 108970(g)(2); § 109000 (a)(3)(B).

22.    While the California Health & Safety Code permits certain levels of organic fluorine in certain products as of January 1, 2023, the omission and non-disclosure of information that is a material concern for consumers is different than compliance under the California Health & Safety Code, which only concerns production and distribution, not otherwise lawful

---

[10] https://www.atsdr.cdc.gov/pfas/health-effects/index.html ; see also https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/#:~:text=A%20recent%20review%20from%20the,of%20asthma%20and%20thyroid%20disease
[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2679623/

disclosures or warnings.  Therefore, required disclosures and warnings are an issue not addressed or covered by the Health & Safety Code.  Indeed, Governor Gavin Newsom's veto message in vetoing a "disclosure" bill for products containing PFAS (Assembly Bill No. 2247) makes clear disclosure requirements are a separate issue not covered by current legislation.[12]

23.    Leading science has also directed that identification of organic fluorine in industry and consumer products is an indicator that encompasses the total content of both known and unknown types of PFAS, unlike traditional targeted analyses that can reliably quantify only a few dozen known PFAS that have commercially available analytical standards.

24.    Plaintiff commissioned independent third-party testing to determine whether the Products contain organic fluorine.

25.    The independent testing by Plaintiff was performed by an independent analytical contract laboratory founded in 1950. The laboratory is compliant with the Code of Federal Regulations (CFR) parts 210 and 211 for analytical subcontract laboratories, as well as GLP/cGMP compliant, FDA registered and maintains a current ISO 17025 accreditation. The laboratory is also listed on the Consumer Product Safety Commission's website as an accredited analytical testing laboratory.

26.    The testing conducted by the laboratory was conducted in accordance with accepted industry standards for detecting the presence of organic fluorine.

27.    The testing was performed at the independent analytical contract laboratory's facilities.

28.    The product tested, the tested product purchase date, the source of the tested product, the test date and the test result are set forth below:

- **Product Tested**: TrafficMaster Artificial  Grass Turf
  **Tested Product Purchase Date**: November 7, 2023
  **Source of Tested Product**: online purchase from Home Depot
  **Test Date**: November 28, 2023
  **Result**: 133 PPM Organic Fluorine

---

[12] www.gov.ca.gov/wp-content/uploads/2022/09/AB-2247-VETO.pdf?emrc=cc359d

CLASS ACTION COMPLAINT

29.    The test result indicates the presence of dangerous levels of organic fluorine. For example, the most recent California legislation pertaining to PFAS in consumer products will limit the total amount of organic fluorine to 50 ppm (see Cal. Health & Safety Code § 108970(g)(2)).

30.    In addition, other third parties have alleged the presence of PFAS compounds in the Products.[13]

31.    Plaintiff is informed and believes that Defendant POLYLOOM and or its agents also tested the Products for the presence of PFAS compounds before and during the proposed class period and that Defendant POLYLOOM's testing found PFAS compounds in the Products.

32.    Because PFAS chemicals are "forever chemicals" and accumulate in the human body, there is in fact no safe manner or level of exposure to humans.

33.    Therefore, the existence of, and potential health risks from, the amount(s) of organic fluorine found in the Products thus implicates health and safety concerns that a reasonable consumer would find material and therefore, Defendants have a duty to disclose the existence of organic fluorine in the Products and omitted facts they were obliged to disclose.

**C.    Defendants' Omission And Non-Disclosure Of The Existence Of Chemicals In The Products Implicates Health And Safety Concerns That A Reasonable Consumer Would Find Material**.

34.    The Products' marketing and advertising, including the website pages, product labels and packaging, were and are uniform and pervasive over the proposed class period.

35.    The marketing of the Products, including the Products' website pages, product labels and packaging omit and do not provide any disclosure of the existence of, and potential health risks from, organic fluorine in the Products.

36.    The marketing and labeling of the Products could and should have provided a disclosure that states, at a minimum, "Caution: This product contains organic fluorine which is

---

[13] See, for example, efaidnbmnnnibpcajpcglclefindmkaj/https://oag.ca.gov/system/files/prop65/notices/2024-00879.pdf; https://oag.ca.gov/prop65/60-Day-Notice-2024-01833

a known indicator of per and polyfluoroalkyl substance ("PFAS"). Exposure to PFAS may cause serious health effects." (Hereafter defined as the "Omission" and/or "Omissions").

37.     Plaintiff and other consumers were not and are not provided adequate information or warning of the existence of, and health risks from, organic fluorine in the Products from the Products' information panel provided by Defendants. Instead, the Products' information panel features misleading environmental claims such as, "Artificial=Sustainable", and "Eco-Friendly".

38.     Defendants' omission and non-disclosure of the existence of, and health risks from, organic fluorine in the Products is unlawful for the following reasons:

    a.  It is contrary to representations made by Defendants.  The existence of organic fluorine in the Products directly contradicts Defendants' marketing.

    b.  It is an omission of a fact that Defendants were obliged to disclose, on the following basis:

        i.  Defendants had exclusive knowledge of material facts not known or reasonably accessible to Plaintiff.  Defendants have exclusive knowledge of the manufacturing process and composition of materials and chemicals in the Products as Defendants are the manufacturers, distributors, and marketers of the Products.  At the time of purchase, Plaintiff lacked the knowledge of the manufacturing process and composition of materials and chemicals in the Products and lacked the expertise to ascertain the existence of organic fluorine in the Products and their risks to human health.  Further, consumers lacked and continue to lack the knowledge of the manufacturing process and composition of materials and chemicals in the Products and the expertise to ascertain the existence of organic fluorine in the Products and their risks to human health. Plaintiff and reasonable consumers must, and do, rely on Defendants to disclose the materials, chemicals, and ingredients in the Products and advise of the risks that may potentially affect the health and/or safety of consumers.

CLASS ACTION COMPLAINT

      ii.    Defendants made and continue to make partial representations that are misleading because some other material fact has not been disclosed. Defendants' Misrepresentations are misleading in light of the omission of the existence of organic fluorine in the Products.

      iii.    The undisclosed information of the existence of organic fluorine in the Products implicates safety concerns that a reasonable consumer would find material.

**D.  Plaintiff's And Consumers' Reliance and Resulting Harm.**

39.    Plaintiff and other consumers were exposed to the long-term marketing and advertising campaign of synthetic artificial grass and omissions set forth herein when purchasing the Products.  Plaintiff and other consumers reasonably understood the long-term marketing and advertising campaign of synthetic artificial grass to mean that the Products do not contain suspected harmful chemicals.

40.    In reliance on the long-term marketing and advertising campaign of synthetic artificial grass, Plaintiff and consumers purchased products they would not have purchased but for the long-term marketing and advertising campaign of synthetic artificial grass and their omission of information regarding the presence of organic fluorine in the Products.  Had Plaintiff and other consumers known the true nature of the Products and had information regarding the presence of organic fluorine in the Products not been concealed by Defendants, they would not have purchased and spent money on the Products.

**E.  Summary Of Notice Of Violations Of Law And Demand For Relief.**

41.    On February 16, 2024, Defendants were served by Plaintiff with written notices which set forth Plaintiff's contentions and requested remedy.  Plaintiff's letter was sent via certified mail with electronic return receipt to Defendants who acknowledged receipt. Defendants rejected Plaintiff's attempts to address the concerns stated herein and instead has allowed the Products to continue to be sold with full knowledge of the alleged claims.

## II.    THE PARTIES

**A.    Defendants**

42.    Plaintiff is informed and believes that Defendant POLYLOOM CORPORATION OF AMERICA ("POLYLOOM") is a manufacturer, marketer, distributor and or seller of the Products.

43.    Plaintiff is informed and believes that Defendant SYNTHETIC GRASS WAREHOUSE ("SGW"), is a marketer, distributor and or seller of the Products.

44.    Defendant HOME DEPOT U.S.A., INC ("HOME DEPOT") is a marketer and seller of the Products.

45.    Plaintiff is informed and believes that Defendant POLYLOOM supplies several synthetic artificial-turf Product lines to SGW and HOME DEPOT, including the Products.

46.    Plaintiff is further informed and believes and based thereon alleges that DOES 1 through 10 were and/or are, in some manner or way, responsible for and liable to Plaintiff for the events, happenings, and damages hereinafter set forth below.  The true names and capacities, whether individual, corporate, associate or otherwise of certain manufacturers, distributors, and/or their alter egos sued herein as DOES 1 through 10 inclusive are presently unknown to Plaintiff who therefore sues the Defendants by fictitious names.  Plaintiff will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and based thereon alleges that DOES 1 through 10 were authorized to do and did business in Los Angeles, California.

**B.    Plaintiff**

47.    Plaintiff Jaime Moreno ("Plaintiff") is a citizen of the State of California and resident of Los Angeles County.

48.    Plaintiff purchased the TrafficMaster Tru Emerald product in Los Angeles County in March 2019.  Plaintiff paid approximately $16.06/ square yard, purchased 42 square yards and paid a total of $726.82 for the Product.  Plaintiff only discovered the presence of organic fluorine in the Products on or about November 2023.

49.    Prior to purchase, Plaintiff was exposed to the long-term marketing and advertising campaign of synthetic artificial grass. Plaintiff reasonably relied on the long-term marketing and advertising campaign of synthetic artificial grass and omissions in deciding to purchase the Products, and he would not have purchased the Products if the true facts had been known. As a direct result of the long-term marketing and advertising campaign of synthetic artificial grass, Plaintiff suffered and continues to suffer, economic injuries.

50.    The Products that were manufactured, marketed, advertised and sold by Defendants over the proposed class period and are currently being manufactured, marketed, advertised and sold by Defendants, and the Product purchased by Plaintiff and tested by Plaintiff as set forth herein, were and are substantially similar. The Products are the same synthetic turf and all have the same essential design and materials.

51.    Plaintiff was exposed to the Products on a daily basis and was therefore exposed to organic fluorine at a heightened level.

### III.    JURISDICTION AND VENUE

52.    This Court has personal jurisdiction over Plaintiff because Plaintiff is a citizen of California and submits to the Court's jurisdiction.

53.    Defendant POLYLOOM CORPORATION OF AMERICA is a Delaware corporation registered with the California Secretary of State and doing business in the State of California. Therefore, Defendant POLYLOOM CORPORATION OF AMERICA is subject to personal jurisdiction in California.

54.    Defendant SYNTHETIC GRASS WAREHOUSE ("SGW") is a company doing business in California with its headquarters located in Anaheim, California. Therefore, Defendant SGW is subject to personal jurisdiction in California.

55.    Defendant HOME DEPOT U.S.A., INC. is a Delaware corporation registered with the California Secretary of State and doing business in the State of California. Therefore, Defendant HOME DEPOT U.S.A., INC is subject to personal jurisdiction in California.

56.    Venue is proper in this District because Defendant POLYLOOM CORPORATION OF AMERICA does not have a registered California street address, Defendant SYNTHETIC GRASS WAREHOUSE ("SGW") is not registered with the California Secretary of State and does not have a registered California street address and Defendant HOME DEPOT U.S.A., INC. does not have a registered California street address.

## IV.    CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this class action on his own behalf and on behalf of all other persons similarly situated. The Class which Plaintiff seeks to represent comprises:

> All citizens of the State of California who purchased the Products in the State of California during the time period of four (4) years preceding the date of the filing of this class action through the present.

> (Referred to herein as "the Class" or "Class Members")

58.    Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

59.    Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.

60.    Adequacy: Plaintiff is an adequate representative of the Class because Plaintiff's interests are the same as the Class in that Plaintiff and the Class Members were subjected to the same omissions and representations by Defendants as set forth herein; Plaintiff intends to prosecute this action vigorously and completely on behalf of himself and the Class Members; Plaintiff has retained competent counsel experienced in prosecuting class actions; and Plaintiff's interests do not conflict with the interests of the Members of the Class. Based thereon, the interests of the Class Members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

61.    Commonality and Predominance of Common Issues: Defendants have acted on grounds common and applicable to the entire Class and therefore, numerous questions of law

and fact are common to Plaintiff and the Class Members that predominate over any question affecting only individual Class Members thereby making relief appropriate with respect to the Class as a whole. Common and predominant factual and legal issues include but are not limited to:

    a.   The Products that were and are currently being manufactured, marketed, advertised and sold by Defendants over the proposed class period and the Product purchased and tested by Plaintiff, as set forth herein, have the same manufacturing process and composition of materials and chemicals and were marketed, advertised and sold by Defendants in the same place and manner.

    b.   The Products are labeled and packaged the same. Therefore, Plaintiff and the Class Members were exposed to the same labeling and packaging for the Products.

    c.   Defendants' marketing and representations about the Products to which Plaintiff and the Class were exposed were the same during the class period and therefore common to Plaintiff and the Class Members.

    d.   Defendants' omissions and non-disclosures as to the Products to which Plaintiff and the Class Members were exposed were the same during the class period and therefore common to Plaintiff and the Class Members.

    e.   Whether the existence of organic fluorine in the Products implicates potential health or safety concerns to Plaintiff and the Class Members.

    f.   Whether the omissions and non-disclosures by Defendants of the existence of organic fluorine in the Products were and are material to Plaintiff and the Class Members.

    g.   Whether the Misrepresentations by Defendants promoting the Products were and are material to Plaintiff and the Class Members.

    h.   Whether the Misrepresentations by Defendants were and are false, deceptive and/or misleading in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, Cal. Bus. & Prof. Code § 17500, *et seq.*

20
CLASS ACTION COMPLAINT

    *i.*   Whether the omission and non-disclosures by Defendants of the existence of, and health risks from, organic fluorine in the Products violates <u>Cal. Bus. & Prof. Code</u> § 17200, *et seq.*, <u>Cal. Bus. & Prof. Code</u> § 17500, *et seq.*

62.    Accordingly, the determination of Defendants' liability under each of the causes of action presents legal issues that are common to Plaintiff and the class as a whole.

63.    Typicality: Plaintiff's claims are co-extensive with those of the Class members as Plaintiff and the Class Members' injuries and claims arise from the same course of conduct by Defendants as alleged herein.

64.    The Class is identifiable and ascertainable.  Plaintiff has precisely defined the Class based on objective criteria whereby Class Members would be able to know whether they are a member of the prospective Class, specifically, all citizens of California who purchased the Products in the State of California during the time period of four (4) years preceding the date of the filing of this class action through the present.

65.    Notice can be provided to such purchasers using techniques and a form of notice customarily used in class actions, including direct notice by email to the Class Members and other California consumers from Defendants' and third-party retailers' records, internet publication, radio, newspapers, magazines and other social media platforms such as YouTube, Instagram, TikTok and Facebook.

66.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. The expense and burden of individual litigation would make it impracticable and impossible for proposed Class Members to afford to seek legal redress for the wrongs complained of herein and prosecute their claims individually.  Therefore, absent a class or representative action, the Class Members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its wrongdoing.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or

---

21

CLASS ACTION COMPLAINT

piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.  Finally, trial on a representative and class basis would be manageable.  Liability may be determined by facts and law common to the Class Representative and the Class Members and monetary damages or restitution may be determined by proven and approved methods on a class wide basis.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500, et seq.**

**(False and Misleading Advertising)**

65.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length.

66.    This cause of action is brought pursuant to Cal. Bus. & Prof. Code § 17500, *et. seq.*, on behalf of Plaintiff and the Class.

67.    As alleged in the preceding paragraphs, the Omissions of the health risks from the organic fluorine and PFAS in the Products and the Misrepresentations as detailed herein constitute unfair, unlawful, and fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*

68.    Defendants intended the Omissions and non-disclosures of the health risks from the organic fluorine and PFAS in the Products and the Misrepresentations and the Net Impression of the Misrepresentations, as detailed herein.

69.    Defendants publicly disseminated marketing and advertising which contained unlawful omissions and non-disclosures of material facts (i.e., the Omissions) and publicly disseminated marketing and advertising promoting each of the Products (i.e., the long-term marketing and advertising campaign of synthetic artificial grass and the Misrepresentations) which Defendants knew, or should have known in the exercise of reasonable care, was untrue or misleading.

70.     Defendants falsely claim that their products are "**non-toxic**". It is deceptive to misrepresent that the Products are non-toxic considering they contain organic fluorine and PFAS.

71.     Defendants falsely claim that their products are "**guaranteed to keep you safe and healthy**". It is deceptive to misrepresent that the Products can keep one safe and healthy considering they contain organic fluorine and PFAS, substances known to adversely affect human health and the environment.

72.     Defendants falsely claim that their products are "**sustainable**". It is deceptive to misrepresent that the Products are sustainable considering they contain organic fluorine and PFAS, substances known to adversely affect human health and the environment.

73.     Defendants falsely claim that their products have "**eco-friendly properties**". It is deceptive to misrepresent that the Products are eco-friendly considering they contain organic fluorine and PFAS, substances known to adversely affect the environment.

74.     Defendants falsely claim that their products are **"made without PFAS" and free of PFAS**". It is deceptive to misrepresent that the Products are free of PFAS considering there are not validated test methods to test and identify all of the thousands of PFAS chemicals and the Products contain organic fluorine and PFAS.

75.     Defendants' Omissions and false, deceptive, and Misrepresentations were material to Plaintiff and the Class Members and played a substantial part and were a substantial factor in influencing Plaintiff's and the Class Members' decisions to purchase the Products.

76.     Plaintiff and the Class Members relied on Defendants' Omissions and the long-term marketing and advertising campaign of synthetic artificial grass and would not have purchased the Products if not for the Omissions and the long-term marketing and advertising campaign of synthetic artificial grass.

77.     Plaintiff and the Class Members have suffered injury in fact and have lost money or property as a result of Defendants' omissions and false, deceptive, and misleading representations and marketing set forth herein.

---

23

CLASS ACTION COMPLAINT

78.     Each of the Products as purchased by Plaintiff and the Class Members were and are unsatisfactory and worth less than the amount paid for them.

79.     All of Defendants' conduct alleged herein occurs and continues to occur in Defendants' businesses.

80.     Wherefore, unless and until enjoined by order of this Court, the omissions and non-disclosures of material information by Defendants that implicate health and safety concerns that a reasonable consumer would find material ( i.e., the Omissions) and the continued false, misleading and deceptive marketing and advertising by Defendants (i.e., the Misrepresentations) will continue by Defendant and cause great and irreparable injury to California consumers.

81.     Therefore, pursuant to <u>Cal. Bus. & Prof. Code</u> § 17535, Plaintiff seeks an order in equity from this Court enjoining Defendants from continuing to engage, use, or employ the practice of falsely marketing and advertising for the sale of the Products as follows:

      a.     An order compelling Defendants to advise Plaintiff and the public of the presence of, and potential health risks from, organic fluorine and PFAS in the Products; and

      b.     An order compelling Defendants to cease use of the Misrepresentations in the marketing, labeling, packaging and advertising of the Products.

82.     In addition, Plaintiff seeks an order awarding Plaintiff and the Class Members restitution of the monetary amounts by which Plaintiff and the Class Members did not receive the value of the Products they paid for and by which Defendants were unjustly enriched.

**SECOND CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, et seq.**

**(Unlawful, Unfair, and Fraudulent Business Acts or Practices and Unfair, Deceptive, Untrue or Misleading Advertising)**

83.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length.

24

CLASS ACTION COMPLAINT

84.    Plaintiff brings this cause of action pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, on his own behalf and on behalf of all other persons similarly situated.

85.    The UCL prohibits "any unlawful, unfair... or fraudulent business act or practice." Cal. Bus & Prof. Code § 17200. Defendant's advertising claims and omissions as set forth herein violates each of these provisions.

### A. "Unfair" Prong

86.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." Camacho v. Auto Club of Southern California, 142 Cal. App. 4th 1394, 1403 (2006).

87.    Defendants' Misrepresentations in the marketing, advertising, packaging and labeling each of the Products are false.

88.    Defendants further omit from their packaging, labels and website and other information provided the potential health risks from the organic fluorine and PFAS in the Products.

89.    Defendants' actions of falsely advertising the status of the Products causes injuries to consumers, who do not receive what they were promised.

90.    Defendants' omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and the false and deceptive marketing, advertising, packaging and labeling of each of the Products (i.e., the Misrepresentations) stifles competition in the marketplace.

91.    Consumers cannot avoid any of the injuries caused by Defendants' false and misleading advertising of the Products.

92.    Defendants' omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and conduct of marketing, advertising, packaging and labeling each of the Products (i.e., the

---

25

CLASS ACTION COMPLAINT

Misrepresentations) results in financial harm to consumers. Thus, the utility of Defendants' conduct is vastly outweighed by the gravity of their harm.

93.     Defendants' omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and conduct of marketing, advertising, packaging and labeling each of the Products (i.e., the Misrepresentations) are false, deceptive, misleading and unreasonable, and constitute unfair conduct.

94.     Defendants knew or should have known of their unfair conduct.

95.     As alleged in the preceding paragraphs, the material misrepresentations by Defendant's detailed above constitute an unfair business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

96.     There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. Defendants could have marketed, advertised, packaged and labeled each of the Products without making the false and deceptive Misrepresentations and without the omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions).

97.     All of the conduct alleged herein occurs and continues to occur in Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

## B.  "Fraudulent" Prong

98.     Defendants' omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and conduct of marketing, advertising, packaging and labeling each of the Products (i.e., the Misrepresentations) is likely to deceive members of the public.

99.    Defendants' omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and conduct of marketing, advertising, packaging and labeling each of the Products (i.e., the long-term marketing and advertising campaign of synthetic artificial grass and the Misrepresentations) are false, deceptive, misleading, and unreasonable and constitute fraudulent conduct.

100.    Defendants knew or should have known of its fraudulent conduct.

101.    As alleged in the preceding paragraphs, the material Misrepresentations and Omissions by Defendants detailed above constitute a fraudulent business practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

102.    There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. Defendants could have marketed, advertised, packaged and labeled each of the Products without making the false and deceptive Misrepresentations and without the omissions and non-disclosures of material information that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions).

103.    All of the conduct alleged herein occurs and continues to occur in Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

104.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. Plaintiff and the Class paid an unwarranted premium for the Products. Plaintiff and the Class purchased the Products under the false belief of the Misrepresentations and the net impression of the Misrepresentations and the Omissions set forth herein. Plaintiff and the Class relied upon the long-term marketing and advertising campaign of synthetic artificial grass and the Omissions of the potential health risks related to organic fluorine set forth herein.   Plaintiff and the Class reasonably relied on the long-term marketing and

advertising campaign of synthetic artificial grass and Omissions in deciding to purchase the Products and would not have purchased the Products if the true facts had been known. Plaintiff and the Class would not have purchased the Products had they known that the Products posed such serious risks to health and safety and not been misled by the false and misleading advertising and omissions and non-disclosures set forth herein.

### C. "Unlawful" Prong

105.    Defendants' business practices, described herein, violated and continue to violate the "unlawful" prong of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating Cal. Bus. & Prof. Code § 17580, *et seq.* (Environmental Advertising).

106.    Defendant's business practices, described herein, violated and continue to violate the "unlawful" prong of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating Cal. Bus. & Prof. Code § 17500, *et seq.*, as detailed herein.

107.    In addition, Cal. Bus. & Prof. Code § 17580.5 makes it "unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied," and defines environmental marketing claims consistent with the Green Guides. The Green Guides caution marketers that "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit," and warns marketers that such claims, for example, lead consumers to believe that the seller's wares have no negative environmental impact. 16 C.F.R. § 260.4.

108.    Defendants falsely claim that their products are "**non-toxic**" in violation of 16 C.F.R. § 260.4 ("General Environmental Benefit Claims") and 16 C.F.R. § 260.10 ("Non-Toxic Claims") (The Green Guides state that unqualified non-toxic claims are further misleading because toxicity depends on dosage, exposure method and individual factors). It is deceptive to misrepresent that the Products are non-toxic considering they contain organic fluorine and PFAS,

109.    Defendants falsely claim that their products are "**guaranteed to keep you safe and healthy**" in violation of 16 C.F.R. § 260.4(a). It is deceptive to misrepresent that the

Products can keep one safe and healthy considering they contain organic fluorine and PFAS, substances known to adversely affect human health and the environment.

110.    Defendants falsely claim that their products are "**sustainable**" in violation of 16 C.F.R. § 260.4(a). It is deceptive to misrepresent that the Products are sustainable considering they contain organic fluorine and PFAS, substances known to adversely affect human health and the environment

111.    Defendants falsely claim that their products have "**eco-friendly properties**" in violation of 16 C.F.R. § 260.4(a). Specifically, § 260.4(d) notes that "eco-friendly" likely conveys that the product has far-reaching environmental benefits and may convey that the product has no negative impact. It is deceptive to misrepresent that the Products are eco-friendly considering they contain organic fluorine and PFAS, substances known to adversely affect the environment.

112.    Defendants falsely claim that their products are **"made without PFAS" and free of PFAS** in violation of 16 C.F.R. § 260.4(a) and 16 C.F.R. § 260.9 ("Free of claims") (provides that it is deceptive to misrepresent, directly or by implication, that a product, package, or service is free of, or does not contain a substance". It is deceptive to misrepresent that the Products are free of PFAS considering there are not validated test methods to test and identify all of the thousands of PFAS chemicals and the Products contain organic fluorine and PFAS.

113.    Defendants knew or should have known of their unlawful conduct.

114.    As alleged in the preceding paragraphs, the Omissions by Defendants detailed herein constitute an unlawful business practice within the meaning of California Business and Professions Code § 17200, *et seq.*

115.    There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. Defendants could have truthfully labeled and advertised each of the Products and provided adequate disclosures of potential risks to human health from use of the Products.

---

29

CLASS ACTION COMPLAINT

116.     Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendants' fraudulent conduct. Plaintiff and the Class paid an unwarranted premium for the Products. Plaintiff and the Class purchased the Products under the false belief of the Misrepresentations and the Net Impression of the Misrepresentations and the Omissions set forth herein. Plaintiff and the Class relied upon Defendants' Misrepresentations and the Net Impression of the Misrepresentations and the Omissions of the potential health risks related to organic fluorine and PFAS set forth herein.  Plaintiff and the Class reasonably relied on these Misrepresentations and Omissions in deciding to purchase the Products and would not have purchased the Products if the true facts had been known. Plaintiff and the Class would not have purchased the Products had they known that the Products posed such serious risks to health and safety and not been misled by the false and misleading advertising and omissions and non-disclosures set forth herein.

117.     All of the conduct alleged herein occurred and continues to occur in Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

118.     Wherefore, unless and until enjoined by order of this Court, the omissions and non-disclosures of material information by Defendants that implicate health and safety concerns that a reasonable consumer would find material (i.e., the Omissions) and the continued false, misleading and deceptive marketing and advertising by Defendants falsely promoting each of the Products (i.e., the Misrepresentations) will continue by Defendant and cause great and irreparable injury to California consumers.

119.     Therefore, pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order in equity from this Court enjoining Defendants from engaging in the above-described wrongful acts and practices, including, but not limited to, an order enjoining Defendants from continuing to engage, use or employ the practice of falsely marketing and advertising for the sale of the Products as follows:

30
CLASS ACTION COMPLAINT

    a.   An order compelling Defendants to advise Plaintiff and the public of the presence of, and potential health risks from, organic fluorine and PFAS in the Products; and

    b.   An order compelling Defendants to cease use of the Misrepresentations in the marketing, labeling, packaging and advertising of the Products.

120.    In addition, Plaintiff seeks an order awarding Plaintiff and the Class Members restitution of the monetary amounts by which Plaintiff and the Class Members did not receive the value of the Products they paid for, and by which Defendants were unjustly enriched.

## VI.    PRAYER FOR RELIEF

1.    An order enjoining Defendants from the practices complained of herein;

2.    An order certifying that the action may be maintained as a Class Action;

3.    For an award of restitution in an amount according to proof at trial;

4.    For an award of attorney's fees pursuant to Cal. Civil Code § 1021.5.

## VII.    FURTHER RELIEF

Plaintiff further seeks actual and punitive damages pursuant to Cal. Civil Code § 3294, pre- and post-judgment interest and such other and further relief as the Court may deem necessary or appropriate.

## VIII.    JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all triable issues.


DATED:  June 20, 2025               STEVENS, L.C.


By: _____

          Paul D. Stevens
          Attorneys for Plaintiff and the Class